Judge Green
delivered the opinion of the Court.*
John Dandridge died early in 1799, intestate, leaving a widow Rebecca, and two infant children John and Lucy. His widow administered on his estate in May, 1799; John Minge her brothér being her surety. In 1S02, she intermarried with George Coche. In 1804 or 1805, her letters of administration were revoked, and administration de bonis non of the estate of Dandridge was committed to Minge. In March, 1806, Coche and wife instituted a suit in Prince George County Court against Minge the administrator de bonis non, and John and Lucy, the infant children of J. Dandridge, for a settlement of Mrs. Cache’s administration account, the assignment of her dower in the land, and her portion of the personal estate. This being a friendly bill, the object of it was immediately effected by a division, assignment of dower, and settlement Of accounts, th.e report of which was not signed by the commissioners *398 until January, 1807, nor returned to the Court until January, 1810, when it was confirmed. Late in 1813, Lucy, then an infant, intermarried with «T-. W. Murdaugh, and shortly afterwards, Mrs. Codee died.
Jn October, 1813, John Minge served a declaration in ejectment on George Codee, for the recovery of the land on which John Dandridge had resided, and in which dower had been assigned to his deceased wife, the widow of Dandridge, and in September, 1814, he recovered a judgment in that suit.
The bill in this case was filed by John Dandridge and Murdaugh and wife, as heirs and distributees of J. Dandridge deceased, against Minge, for an injunction to the execution of that judgment. The bill charges, that in 1795 or thereabouts, J. Dandridge purchased about800acres of land from Minge, who delivered to him the deeds, and put him in possession of the land, and took his bonds for the purchase money: that in part payment of the purchase, Dandridge assigned to Minge, on the back of one of the bonds, his wife’s interest in her father’s estate, of which Minge was the executor; and that a large part of the purchase money has been paid in cash, and one of the bonds taken in: that Dandridge died in 1798, leaving a large estate; and Rebecca, his widow, administered on it, and Minge was her surety: that afterwards, Minge administered on the estate of Dandridge, unadministered by the former administratrix: that the estate has been wasted, both by the administratrix and the administrator de bonis non; and that Minge is also indebted to the estate of Dandridge, and that his responsibilities on these various accounts are more than sufficient to discharge the balance of the purchase money of the land unpaid.
The answer of Minge admits the sale of the land to Dandridge, and statesthathe conveyed the land to Dandridge, and took from him his bonds and a mortgage upon the land, to secure the purchase money; admits that the legacy given to Mrs. Dandridge by her father, was to be credited *399 on the first bond, which was done upon a settlement between him and Dandridge, as to the amount of the legacy; and the balance of the first bond was paid to him; admits that after the estate of Dandridge was taken out of the hands of Rebecca Dandridge, then Rebecca Cocke, he qualified as administrator of J. Dandridge, but that he sold no part, of the estate at that time, except an old and useless chariot: that the whole of it remained on the land for the support of the children of Mrs. Dandridge, and in possession of Mr. George Cocke, and the said Rebecca; and that since her death, which happened some time past, the real and personal estate of every kind was taken possession of by the complainant J. JV. Murdaugh, and was then in his possession, or the possession of those claiming under him, except the cattle, sheep, hogs, and some household furniture, which the defendant sold for the benefit of the estate, rather than see the whole go to ruin and starve: that he is administrator of D. Minge, the father of himself and Rebecca Dandridge; but, that the plaintiffs have no claim against him on that account, nor is he indebted to Dandridge’s estate on any other account; and prays a decree for the sale of the mortgaged premises.
In the progress of the cause, accounts were ordered of J. Minge’s administration of the estate of D. Minge, Rebecca Dandridge’s administration, and John Minge’s administration of J. Dandridge’s estate, and between J, Dandridge and J. Minge.
From the reports of the commissioners and other documents in the cause, it appears, that Dandridge purchased the land from Minge, on the 23d of March, 17.96, for 2400/. payable in equal instalments of 800/. on the 1st of October in the years 1798, 1800 and 1802; for which Dandridge gave his bonds. On the first bond was a memorandum, that David Minge’s legacy to his daughter Rebecca, should be credited on that bond, when ascertained. This appears to have been done, and the balance of that bond paid, in part by J. Dandridge, and in part by his adminis *400 tratrix; and the bond given up to the latter. The commissioners’ reports shew, that a balance was due to the administratrix on her account of the administration of the estate, and a balance of $ 32 32, due from Minge, on his account of the administration of Dandridge. The Court decreed a sale of the land, to pay the two remaining bonds for the purchase of the land, and interest, after deducting this balance of $ 32 32; from which an appeal was taken. J. Dandridge renounces this appeal, declaring that Murdaugh used his name in taking the appeal, without authority.
From these reports and documents, it appears, that the personal estate of Dandridge, including 19 slaves, was valued at 1700Í. 3 4: that there were large debts due to him, collected by hi? administratrix and administrator de bonis non: that from the death of Dandridge, early in 1799, to the death of his widow in 1813 or 1814, the whole estate real and personal of Dandridge, remained in her hands and in those of Cocke her second husband, without any account rendered, either by her or the administrator de bonis non, who qualified in 1804 or 1805, either for the rents of the land, or the profits of the personal estate, except, that the administrator de bonis non accounts for the hires of the two negroes, from the year 1807 to 1813 inclusive, and for the perishable property sold after her death. The children were not wholly supported out of the profits of the property retained by their mother and second husband; for, there are large charges in the administration account of Minge, for advances made for their maintenance.
It appears, that the debts due to Dandridge were more than sufficient to pay all his debts, except the two last bonds due to Minge, and that the personal property inventoried-was more than sufficient to pay those bonds.
It was the duty of the administratrix and administrator de bonis non, to apply these funds to the payment of those bonds; so as toexonerate the land for the benefit of the in *401 tant heirs. The maintenance of the children, (saying no. thing of the support of the widow and her second husband) was no excuse for the failure in this duty. Their interests cannot be so sacrificed by their guardian, or any one dealing with their affairs as guardian. Whilst the whole fruits of the real and personal property were thus enjoyed by the widow and her second husband, without account, the interest on the large debts due to Minge, was allowed to accumulate, so as to swallow up the whole of the real estate; and this, with the concurrence of Minge, after he had administered on Dandridge’s estate. There is in the record, an account between John Minge, administrator of Dandridge, and George Cocke, exhibited by Minge, as a voucher for a charge against the estate, for 18i. 11 6, the balance of that account paid by him to Cocke; from which it appears, that after the assignment of dower in the land and slaves to the widow in 1800, in a suit in which Minge was a party, Cocke gives credit to Minge for 41. 19 1J, annually for the taxes paid on the land; by which it appears, that Minge, acting for the children, agreed that Cocke should have their lands, only for paying the taxes. The only other credit in that account to Minge as administrator, is, for the hire of Billy, from 1807 to 1812, both years included, at 15i. per annum, which is balanced by an equivalent charge of an equal sum for the board of Lucy Dandridge.
Under these circumstances, the administratrix and her sureties, and the administrator de bonis non, are respectively liable for all the profits of the slaves and other personal property, during the periods of their respective administrations; and the latter, for the value of the slaves and other personal property, to the extent of what may be necessary to satisfy the debts due to Minge, if they be sufficient for that purpose, unless the acts or admissions of the parties, having a right to enforce this responsibility, have precluded them from claiming. This seems to be the case as to John Dandridge, who has assented to the settlement *402 of the accounts as made in this cause, and acquiesced in the (lecree> (but °n this point no decision is intended to be made;) and this might be the case as to Murdaugh and wife, if he actually, as is alleged, took possession of the w’hole property after Mrs. Cocke’s death, (an allegation not proved;) and if also Mrs. Murdaugh (he being dead) is bound by his acts or admissions made in the course of this cause.
This, as a general question, is highly important; and in forming an opinion on it, I have had but little assistance from the books to which I have had access., Mrs. Murdaugh, as heir and distributee of her father, was entitled to a part of his real estate, subject to a.mortgage, and of his personal estate after the payment of his debts. If the personal estate was delivered over to her husband, she lost her real estate unless he chose to pay the debt; and her husband would hold the personal property exclusive of the rights of her and her heirs. If the personal estate was duly applied to the payment of the debts, the.land would be se'cured to her and her heirs; and the husband would have had no interest in the subject, except his marital right during the coverture, and- the possibility, if he survived . her, of being tenant by the curtesy. In this case, could the husband rightfully elect that his wife’s property should be real or personal, at his pleasure, with or without the concurrence of the personal representative? I think not. This would be to give the husband virtually, under such circumstances, an absolute right to the wife’s real estate. The wife not only has- the legal right, but the strongest equity in such a case against the husband, to have the personal property applied to the exoneration of the real; rights, which she could not be deprived of without her privy examination, by any act of her husband, either with or without the concurrence of the personal representative. If Minge consented to Murdaugh’s taking possession of the personal property, he practised a fraud in collusion with him, upon the rights of his wife. If Murdaugh took it *403 without his consent, he was a wrong-doer, and responsible to the administrator.
This point was not insisted on in the pleadings or proceedings in the cause, but it appears palpably in the record; and it was the duty of the Court ex- officio, when the right of the wife, legal or equitable, against the husband, appeared clearly, to protect her from any injurious effects arising from the acts or admissions of her husband. And although she was a joint plaintiff with her husband, she was not bound by any proceedings or admissions in the cause by her husband, especially affecting her inheritance. A bill by husband and wife, is the husband’s suit only, and the wife is joined for conformity, to be bound only so far, as in justice she ought to be bound.
These views are supported by what fell from Lord Hardwicke, in Pawlett v. Delaval, 2 Vez. 663. lie states, that “ a bill filed in the name of husband and wife, claiming in right of the wife, is the bill of the husband. ” After stating the case of the Court’s refusing, upon the bill of a husband and wife, to decree even the personal property of the wife to the husband, unless with her consent, given in Court upon a privy examination, or unless an adequate settlement be made, upon the ground, that in such cases, the wife hfis, in respect to such property, an equity against the hiisband, he observes, “ But that is” (the refusal to decree the property to the husband) “ because all suits or defences in this Court, by husband and wife jointly, when there is no appearance by guardian, for the wife, are considered as suits and defences of the husband, and therefore, will not suffer the money to be paid to the husband, on the prayer of his counsel; because the Court knows those instructions to counsel come from the husband, who has the power of the suit and defence; and therefore, the Court expects the wife to attend in Court, to give her consent.” The Lord Chancellor applied these principles to the case under consideration, under the following circumstances. By a marriage settlement, it was agreed that 23,000i. *404 should be settled to the separate use of the wife. They had a daughter, and the husband died. There were some transactions between the husband and wife, in his life-time, from which it was inferred, that she had surrendered this fund to her husband for his own use. The widow married again; and some transactions between her second husband and herself, shewed that the 23,,0001. was then considered as a part of the first husband’s estate. The daughter claimed this fund as a part of her father’s assets. The second husband and wife filed a bill, claiming it as still belonging to the wife, under the original settlement, and to set aside the subsequent transactions, from which her surrender of this fund to her first husband was inferred, as founded in mistake. The Lord Chancellor said, “ another consideration very material is, that this is the bill of the husband. It might have been something of a different question, if the bill had been by Lady Isabella herself, or by her prochein amy, claiming her separate property; not that it would turn the question; but every bill by husband and wife, jointly claiming in right of the wife, is the act of the husband, and the claim is by the husband, though in right of his wife, though she joined for conformity. Consider what would be the consequence of giving relief. It is impossible to conceive, supposing Lady Isabella mistaken in what she did, that she meant to give Mr.. Delaval, (her second husband,) so large a sum, without mentioning it. Is he, then, to be taken in this Court, not only against Miss Pawlett, (the daughter,) but against her, to have a right to this large sum, under an et csetera ?” and he decreed for the daughter.
In the case of Evans v. Cogan, 2 P. Wms. 451, it is said, that “a feme covert cannot bind herself as to her inheritance by her answer;” and much less can her husband bind her. As to her personalproperty, the answer of husband and wife, and depositions taken in the cause, bind her after the husband’s death, but not as to her inheritance, Shelberry v. Briggs, 2 Vern. 249; and when *405 husband and wife sue, and the husband dies, the wife is not bound by the proceedings in the cause, but may bring a new bill for the same matter. 2 Vern. 197, anonymous. And in the case of Sperling v. Rochfort, 8 Ves. 164, the circumstance of the wife joining the husband in a bill for transferring to him a trust fund settled on her, though not for her sepárate use, is treated as amounting to nothing, and as not affecting her interests.
In this case, the inheritance of Mrs. Murdaugh is affected by these proceedings, erroneous as to her, and she is not bound by them. The decree must therefore be reversed as to her, and the cause remanded to be further proceeded in, according to the foregoing views.

 The President ami Judge Cojxter absent.