Staples, J.,
delivered the opinion of the court.
. This bill is filed against the heirs and personal representatives of a trustee. It complains of a breach of trust on the part of the trustee, the waste and misapplication of the trust subject; and it asks for a discovery and account. • The transactions of which complaint is made occurred between eighteen hundred and eight and eighteen hundred and eighteen, nearly sixty years ago, and more than forty years before the bill was filed. The complainants admit they are without any definite information in respect to the trust property; and they call on the defendants for a discovery. All the original parties are dead; and the defendants sa,y they have no •knowledge or information on the subject; nor have they possession of or access to documents or papers other than the records of the court, throwing any light upon the .transactions of the trustee; and they rely upon the staleness of the demand and the lapse of time as a bar to any recovery in the case.
I think the defence is a good one, and ought to be sustained. I do not rely, however, exclusively upon the lapse of time or the laches of complainants. While the transactions are veiled in great obscurity, there is enough in the record to satisfy the mind that the trust ■property was neither wasted by the trustee or with Ms *219 consent, nor converted by him to his own use; but was jwoperly applied to the purposes contemplated by the parties to the trust.
By the provisions of the deed the trustee was not only authorized, but he was required to sell so much of the trust property, real or personal, as was necessary to discharge all the grantor’s debts, and also the debts due and recoverable from “the estate of Benjamin Harrison dec’d; then to allow the grantor, out of the proceeds, a genteel support during his life; and the residue of such proceeds to be paid to Mrs. Margaret L. "Wagoner, the wife, yearly and every year or her use, so long as she shall live.” At her death the estate, or what remained of it, the trustee was directed to convey to the children then living and to the descendants of those that were dead. This deed was executed in April, 1808. The grantor died in 1809. Between the date of the deed and the 1st of January 1816, the trustee paid debts of the grantor, including an annual allowance to Mrs. "Wagoner, amounting to §2,658 38 cents. He also satisfied a decree against the estate of Benjamin Harrison, dec’d, amounting to 1,781 dollars. There was in addition to these debts a claim held by John Gibson, jr., amounting to $1,080 for services rendered the estate, which was never paid by the trustee.
The trust deed originally embraced four tracts of land; one of these was sold in 1810 to French, another to Fox, another to Orem, and the proceeds applied in payment of the foregoing debts. "Wiry the deeds executed to some of these purchasers expressed a nominal consideration only, it is impossible now to say; but this is not very material, as the purchase money was faithfully accounted for by the trustee. Indeed, the complainants concede in their bill that three of the tracts were sold and the proceeds properly applied; but they *220 insist that- no account has been given of the fourth, and by far the most valuable tract. That will be the subject of consideration hereafter.
It appears that the accounts of the trustee, from the commencenient of the trust to the first of January 1816, were referred to a commissioner of the County court, and were regularly settled by him. The affidavits and exhibits -filed with the commissioner, show that all the transactions of the trustee were the subject of rigid investigation, and that the sales made by him were perfectly understood and acquiesced in as necessary and proper.
When the account was completed, it was submitted to Mrs. Wagoner and her son-in-law, Russel Harrison, for examination. Ho objection was made by either of them, except to the claim of John Gibson, jr., for services rendered the estate. That claim was excepted to and made the subject of a controversy before the County court, at the June term, 1816. The exception was overruled, and the report of the commissioner sustained and. confirmed. The report thus confirmed showed a balance due the trustee of two hundred and thirty-three dollars, and 39 cents, and the sum of one thousand and eighty dollars and 17 cents, due John Gibson, jr., as before stated. It was necessary to make some provision for the payment of these debts. This could only be done by a sale of a portion of the slaves, or of the only remaining tract of land known as the “ Mansion house tract.” The trustee was authorised to sell both or either. It is highly probable that Mrs. Wagoner and her daughter preferred to retain the slaves and surrender the land. Be that as it may, it appears that afterwards, on the 16th of February 1817 the trustee sold and conveyed this “ Mansion house tract” to John Gibson, jr., at the price of fourteen hundred dollars. This sum would have about satisfied *221 the claims of the trustee and John Gibson, jr. It was probably so arranged and agreed by the parties, as we hear nothing of these debts at any time after this sale. It may he, as insisted by complainants, that the fourteen hundred dollars was a very inadequate price for the land. It would be very difficult, in 1854, when this suit was brought, to fix the market value of 280 acres of land in the year 1817. That the transaction was perfectly fair and satisfactory to all the parties is proved by the fact that Mrs. "Wagoner, the widow, Russel B. Harrison and his wife Mrs. Mary Harrison, united with the trustee in executing the deed of conveyance. Mrs. Wagoner was the life tenant, and Mrs. Harrison would, in all human probabilhy, survive her mother, and thus become entitled to the estate in fee simple. They were then the only parties interested in the trust property. Mrs. Harrison, it appears, died in 1823, her husband in 1835, and Mrs. Wagoner in 1840. So far as this record discloses, neither of them made any objection to the claim of John Gibson, jr.. after the decision of the County court; neither made any complaint of any waste or improper management, or conversón of the trust property by the trustee, or by his connivance or consent.
And now as to the slaves conveyed in trust. There were eight originally; three men, two women, and three children. One of the men was sold by the trustee in 1816, and the proceeds applied in paying debts. In 1830 seven were sold by the trustee, to satisfy a decree against the estate of Beverly R. Wagoner. Of these seven, two only were embraced in the deed. What became of the others it does not appear. As five of them were grown in 1808, when the deed was executed, it is not difficult to believe that in the long interval between that period and the death of Mrs. Wagoner, in 1840, they may have died or become old and worthless, or escaped *222 into a non-slaveholding State. There is not the slightest reason for believing that the trustee ever appropriated any of them to his own use, or ever permitted any one else to do so, without accounting for the proceeds. It is difficult to believe that Mrs. Wagoner, who was directly dependent upon the labor of these slaves for the support of herself and her grand-children, would have consented to such a violation of her right of property. •
The female complainants were married respectively in 1836, 1838, and 1841. It is probable the youngest attained the age of maturity in the latter year. We hear nothing of any complaint on their part, or on the part of their husbands, until fourteen years after the death of Mrs. Wagoner, when this suit was brought. It is true that in 1846 John Gibson, jr., seems to have had some notification of the purpose of the complainants to institute a suit against him or against his father’s estate; and he then requested one of the complainants, Judge Purcell, if such was their intention, to bring the suit at once, while he was alive and could defend it: They, however, did not think proper to pursue that course; they waited eight years longer, until after the death of John Gibson, jr., and the death of every other person who could throw any light upon these transactions. And now they call upon the courts, after the lapse of forty years, to set aside the decision of the County court in favor of John Gibson’s debt, as coram non judice, to re-open for investigation the question of the validity of that debt, to enter into an inquiry touching the sale and conveyance of the real estate; and indeed to overhaul all the transactions of the trustee, upon vague charges and surmises of a violation of trust duties.
It is impossible that any such investigation can now be had; as the materials for it are not in existence. It is. impossible that justice can be done after this long- *223 lapse of time. The complainants are not. entitled to the aid of a court of equity for any such purpose. They have slept upon their rights, if they ever had any. is a familiar doctrine of courts of equity that nothing can call forth these courts into activity but conscience, good faith and reasonable diligence. Where these are wanting, the court is passive and does nothing. I shall not undertake to review the cases, or to discuss the principles bearing upon this point. The whole subject has been repeatedly considered by this court, and the law well settled. The cases do not fix any period as limiting the demand for an account. If, from the delay which has taken place, it is manifest that no correct account can be rendered, that any conclusion to which the court can arrive must at best be conjectural, and that the original transactions have become so obscured by time and the loss of evidence and the death of parties, as to render it difficult to do justice, the court will not relieve the plaintiff. If, under the circumstances of the case, it is too late to ascertain the merits of the controversy, the court will not interfere, whatever may have been the original justice of the claim. 2 Lomax on Executors, 488, margin.; Carr's adm'r v. Chapman's Legatees, 5 Leigh 164; 2 Story’s Eq., Iu. sec. 1520 a.; Perry on Trusts, sec. 869.
It is urged, however, that the female complainants were infants at the death of their mother; to which was superadded the disability of coverture. On the contrary, at that time they were all adults, with the exception of one, who arrived at maturity in 1841. It is true, they were femes covert, and so continued to the institution of this suit. But the bill in this case, though in the name of husbands and wives, is the bill of the former only; for it is well settled that every bill by husband and wife, jointly claiming in right of the wife, is the act of the *224 hustjand, though iu right of his wife. She is, however, joined for conformity. Dandridge v. Minge, 4 Rand. 397; Caperton v. Gregory, 11 Gratt. 505; Hillis v. Hambleton, adm'r, 10 Gratt 300.
In this case the husbands were under no disability, and they could have filed this bill as easily in 1840 or 1841 as in 1854. At that time John Gibson, jr., was alive. He alone could explain the origin, character, and grounds of his .claim against the trust estate. If that claim was valid, the sale and conveyance to him are satisfactorily explained, and the real estate fully accounted for. Indeed, the justice of this debt being conceeded, there is really no ground for any serious controversy. The propriety and necessity of bringing the suit in the life time of John Gibson, as complainants were requested to do, are apparent. Ho record is given, no reason suggested for this delay. And although the time which has elapsed since the death of Mrs. Wagoner may not, of itself, constitute a statutory bar to the claim, still, the unaccountable neglect of the parties for fourteen years thereafter to prosecute any suit, when considered in connection with the other circumstances, is very persuasive against the equity and justice of that claim. I think they fully justified the court below in dismissing the bill.
For these reasons I am of the opinion the decree should be affirmed.-
Decree affirmed,